685 So.2d 622 (1996)
James E. JACKSON, Jr., and Kaye Bankston Jackson
v.
Ronald J. FRISARD, et al.
No. 96 CA 0547.
Court of Appeal of Louisiana, First Circuit.
December 20, 1996.
Writ Denied March 14, 1997.
*623 John W. deGravelles, Benjamin L. Guelfo, Baton Rouge, for Plaintiffs/Appellees James E. Jackson, Jr., and Kaye Bankston Jackson.
Thomas D. Fazio, Baton Rouge, for Defendant/First Appellant State of Louisiana, Department of Public Safety and Corrections.
Joseph R. Ward, Jr., Christina P. Fay, New Orleans, for Defendant/Second Appellant State Farm Fire and Casualty Company.
Before WATKINS, KUHN, and GUIDRY[1], JJ.
KUHN, Judge.

I. THE ISSUES
This personal injury case presents the issues of 1) whether a co-employee committed an intentional tort causing injury to another co-employee, 2) whether the employer is vicariously liable for the damages caused by its employee, 3) whether the trial court erred in calculating plaintiff's award for impairment of earning capacity, and 4) whether a homeowner's liability policy excludes coverage for the injuries sustained by plaintiff pursuant to a "business pursuits" exclusion.

II. FACTS AND PROCEDURAL BACKGROUND
Plaintiff, James E. Jackson, Jr., was employed by defendant, the State of Louisiana, through the Department of Public Safety and Corrections ("the State"), as a state trooper. On December 15, 1988, Jackson and approximately twenty to thirty other state troopers attended an in-service defensive tactics training session in Baton Rouge, Louisiana at the State Police Training Academy. Jackson and defendant, Ronald J. Frisard, were partners for the purpose of practicing the defensive techniques being taught during the session. The parties do not dispute Jackson sustained a back injury on the day of the training session. However, the parties do dispute what actions or conduct occurred during the training session and what circumstances caused Jackson's injury.
Jackson testified that Sergeant Aubrey Futrell was the instructor for the training session and that the purpose of the session was to teach the officers how to deliver disabling blows without causing permanent injury. Jackson explained that during the session, he was on his hands and knees watching the instructor and that Frisard was standing next to him. He stated that during the middle of the demonstration, he heard an utterance from Frisard and then felt a blow to his back. Although he did not actually see who struck him, he explained that Frisard was the only person standing in his immediate *624 proximity. He recalled the force of the blow laid him flat out on the canvass and he was disoriented for about twenty minutes. He remembered that Futrell walked over and talked to him about the incident. He also remembered Futrell commented that he was concerned about horseplay because injuries had occurred during these training sessions in the past. Jackson further recalled that there was a discussion between Frisard and Futrell during which Frisard acknowledged he had hit Jackson in the back but that Frisard had not intended to hurt him.
Jackson did not participate during the remainder of the training session. He stayed in the bleachers until the end of the session and then drove to the State Police Troop A headquarters to fill out a first report of injury. The report indicates, "[O]fficer was in in[-]service defensive tactics when he recieved (sic) a blow to the lower back (right kidney.)." The report further described the nature of the injury as "serious lower back pain." Jackson explained he could not completely fill out the report because his pain was severe. Later than evening he sought medical treatment at an emergency room facility.
Although Jackson returned to work approximately one week later, his pain progressed and he eventually underwent a lumbar fusion back surgery After the operation, Jackson did not return to work as a state trooper. Jackson's physician advised he could perform work that does not require repetitive heavy lifting, that allows movement, and that does not risk further injury to his back.
Frisard[2] testified that he did not hit or strike Jackson in the back during the December 15, 1988 training session; he did not recall any event involving a back injury or back pain. Frisard stated he was with Jackson the entire day and if anything had happened to Jackson, he would have seen it. Frisard acknowledged it was possible something minor could have happened which he did not recall. He said he was not involved in horseplay or any technique which involved striking a person in the lower back on that day; he was involved in other types of techniques, one being a subduing maneuver, which required him to have physical contact with Jackson. Frisard explained he was not aware of any problem with Jackson's back until he found out he had been sued. Frisard stated if he did strike Jackson, he did not intend to hurt him. He said he had never done anything intentionally to hurt Jackson.
Glynn J. Delatte, Jr., another state trooper who participated in the December 15, 1988 training session, testified that the instructor was located in front of him, and Jackson and Frisard were positioned behind him to his right. He explained that when the incident involving Jackson occurred, the instructor was demonstrating a technique whereby the partners were together with one officer positioned in front on his knees and the other one standing behind with his hands on the shoulder of the officer positioned in front. At one point, Delatte heard Jackson moaning. When Delatte turned around, he saw Jackson lying on the ground holding his back in the area of his kidneys. He recalled that Frisard "made some comment that, you know, this shit really works, or something like that, to that effect," and that Frisard's hand was in a closed fist when he made the comment. Delatte described that Frisard was standing over Jackson and was laughing and the other officers around him were laughing when he made the comment. Delatte further testified that Frisard said, "I can't believe I'm that strong." Delatte explained that Frisard's comments were made in a joking way and everyone thought the incident was a joke.
Delatte testified that Futrell came over to Jackson and helped him up off of the ground. Jackson then limped over to the bleachers and remained there for the remainder of the session. When the incident occurred, Delatte thought Jackson may have been exaggerating his pain in order to avoid participating for the rest of the session. He recalled everyone was laughing with the exception of Jackson.
Sergeant Futrell testified he has taught the in-service defensive tactics training session *625 on a regular basis since 1987. He stated he did not recall an incident involving Jackson being struck by Frisard but acknowledged it could have occurred. He stated his memory regarding the December 1988 session had diminished over the years. He testified he never taught, demonstrated or condoned a technique involving a blow to the low back. He explained the procedure he used during the training session was that he would demonstrate a technique and then have the officers pair off and practice the technique themselves. He explained that a pressure point and control tactics system was taught, which had resulted in some shoulder and knee injuries, but he did not recall any back injuries occurring during these sessions. He stated he would have been aware if one of his officers had been injured and down for twenty minutes. He further testified that if there had been horseplay during a session resulting in serious injury, he would have been required to report the incident to make sure it did not happen again. He had not reported any incident involving allegations of horseplay by Frisard. Futrell also stated that if he did not believe Jackson was seriously injured, Futrell may have simply told him to sit out and then to complete the first injury report.
Sergeant Gary Paul Chambers testified that Jackson came in to the desk area of Troop A to complete a first report of injury form on December 15, 1988. Jackson told Chambers he had been hit in the back by Frisard. Chambers stated that Jackson appeared to be in a lot of pain and was not able to complete the form.
Jackson[3] filed suit naming the State, Frisard, and State Farm Fire and Casualty Company ("State Farm"), Frisard's insurer [4], as defendants. Jackson alleged he was injured during the December 15, 1988 training session when Frisard struck Jackson in the lower back with his doubled fist; he and Frisard were within the course and scope of their employment with the State when the incident occurred; Frisard's act of striking plaintiff was intentional within the meaning of La. R.S. 23:1032; the State is vicariously liable for Frisard's actions; and Jackson has undergone surgery, has sustained great pain, and a loss of past, present and future earning capacity as a result of the incident. Prior to trial, all claims against Frisard were dismissed with prejudice.
In written reasons for judgment, the trial court found Frisard struck Jackson while engaged in horseplay during the training session and that such conduct was an "intentional act" under La. R.S. 23:1032. Accordingly, the trial court determined plaintiff's recovery was not limited by the exclusivity provisions of the workers' compensation act. The trial court concluded the State was vicariously liable for the damage resulting from Frisard's intentional act, finding Frisard's actions were so closely connected in time, place, and causation to his employment duties as to be a risk of harm fairly attributable to the business of the State. With respect to insurance coverage, the court found State Farm's homeowner's liability policy provided coverage for the liability arising out of Frisard's horseplay and that the policy's "business pursuits" and "intentional act" exclusions were not applicable. The trial court awarded judgment in favor of Jackson and against the State and State Farm, which included a pain and suffering award in the amount of $145,000.00, a past lost wages award of $66,536.00, a future lost wages award of $126,226.00, and an award of $120,000.00 for impairment of earning capacity.[5]
The State and State Farm have appealed. The State asserts the trial court erred: 1) in finding that Frisard committed an intentional act on Jackson during the training session, 2) in finding that the State was vicariously liable for the damages which were allegedly *626 caused by Frisard's actions, and 3) in calculating the impairment of earning capacity award. State Farm asserts the trial court erred in concluding that 1) Jackson was injured as the result of horseplay or a practical joke, and 2) State Farm's homeowner's liability policy provided Frisard with coverage for an alleged battery occurring while he was engaged in his employer's required defensive training class, a purely business pursuit.

III. ANALYSIS

A. Finding of Intentional Act
The Louisiana Workers' Compensation Act ("the Act") provides for compensation if an employee sustains personal injury as the result of an accident arising out of and in the course of employment. La. R.S. 23:1031. Generally, the rights and remedies granted to an employee under the act are exclusive of all rights and remedies against the employer, any officer or principal of the employer, or any co-employee. La. R.S. 23:1032. However, an exception to this rule is that the act does not affect the liability of an employer, principal, officer, or co-employee resulting from an "intentional act." In Bazley v. Tortorich, 397 So.2d 475 (La.1981), the supreme court held that compensation shall be an employee's exclusive remedy against his employer for an unintentional injury covered by the act, but that nothing shall prevent an employee from recovering from his employer under general tort law for an intentional tort. Caudle v. Betts, 512 So.2d 389, 390 (La.1987) (citing Bazley v. Tortorich, 397 So.2d 475, 482 (La.1981)).
In Caudle v. Betts, 512 So.2d 389 (La. 1987), the supreme court addressed the issue of whether an electrical shock administered to a worker by his employer's chief executive officer ("CEO") as a practical joke constituted an intentional tort. In Caudle, the trial court found the CEO had intentionally shocked the employee with an auto condenser as a practical joke without the employee's consent or approval but that the serious injury to the employee which resulted was neither foreseeable nor intentional. Id. at 391.
The supreme court determined the conduct was intentional, finding a harmful or offensive contact with a person, resulting from an act intended to cause him to suffer such a contact, is a battery. Id. at 390. The court reasoned that the actor need not have a malicious intention nor an intention to inflict actual damage. Id. at 391. The court further stated:
The intent with which tort liability is concerned is not necessarily a hostile intent, or a desire to do any harm. Rather it is an intent to bring about a result which will invade the interests of another in a way that the law forbids. The defendant may be liable although intending nothing more than a good-natured practical joke, or honestly believing that the act would not injure the plaintiff, or even though seeking the plaintiff's own good.
Id. at 392 (citation omitted).
The Caudle court found the facts were undisputed that when the chief executive officer shocked the employee, he intended the contact to be offensive and at least slightly painful or harmful. The court concluded that the fact the CEO's action was intended as a practical joke and he did not intend to inflict actual damage did not render him immune from tort liability. Id.

In the present case, the State asserts there is no direct evidence to support a finding that Frisard intentionally struck Jackson, and that the trial court did not make an express finding that a harmful or offensive contact was intended by Frisard. State Farm contends there is no evidence that the officers were engaged in horseplay or a practical joke at the time of Jackson's injury.
Examining the record in its entirety, and particularly the testimony of Jackson and Delatte, we find the record supports the trial court's finding that Frisard intentionally struck Jackson while engaged in horseplay, and we cannot say that the trial court's conclusion was an unreasonable one. The testimony of these witnesses establishes a reasonable factual basis for the finding of the trial court and establishes the finding is not manifestly erroneous. The trial court found that Jackson's and Delatte's account of the incident were more credible than Frisard's version. *627 Stobart v. State, Through Dept. of Transportation And Development, 617 So.2d 880, 882 (La.1993).
The trial court's finding that Frisard intentionally struck Jackson while engaged in horseplay is supported by: Jackson's description of the forceful blow to his back; Frisard's proximity to Jackson during the training session; Jackson's recollections of Frisard's acknowledgment that he had hit Jackson and of Futrell's concern about horseplay; and Delatte's recollections that Frisard commented "this shit really works," that Frisard was standing over Jackson and laughing immediately after the incident, and that the officers were laughing regarding the incident. Based on the Caudle analysis, we find the trial court properly concluded that such conduct was an "intentional act" pursuant to La. R.S. 23:1032, and that plaintiff's recovery was not limited to workers' compensation benefits.

B. Vicarious Liability
La. C.C. art. 2320 provides the basis for holding an employer liable for the actions of its employees, as follows:
Masters and employers are answerable for the damage occasioned by their servants and overseers, in the exercise of the functions in which they are employed.
. . . . .
... [R]esponsibility only attaches, when the masters or employers, ... might have prevented the act which caused the damage, and have not done it.
An employer may incur vicarious liability for the intentional acts of employees. Jones v. Thomas, 426 So.2d 609, 612 (La. 1983). Each question of an employer's responsibility for damages for an intentional tort of an employee must be looked at on its own merits to determine whether the conduct should be regarded as within the scope of employment. Ermert v. Hartford Ins. Co., 559 So.2d 467, 477 (La.1990).
The test for employer liability was established by LeBrane v. Lewis, 292 So.2d 216 (La.1974).[6] In LeBrane, a hotel supervisor, who had the authority to hire and fire employees, terminated an employee who lingered around the hotel after being instructed to leave the premises and to get a haircut. The supervisor and employee began to argue while inside the hotel. After the two walked outside of the building, a fight began during which the supervisor stabbed the employee.
The court found the fight was "employment-rooted," the fight was reasonably incidental to the performance of the supervisor's duties in connection with firing the recalcitrant employee and causing him to leave the place of employment, and the fight occurred on the employment premises and during the hours of employment. Id. at 218. The LeBrane court held that an employer is responsible for an employee's intentional tort when the conduct is so closely connected in time, place and causation to the employment duties that it constitutes a risk of harm attributable to the employer's business. Id. Thus, the tort was found to be within the scope of the supervisor's employment, resulting in the employer being held liable in tort to the discharged employee.[7]
In this case, the State urges that if a battery did occur, a battery of a trooper by another trooper should not be considered part of the business of law enforcement; the battery was not motivated by an intent to serve the interests of law enforcement; and the battery was not reasonably incidental to the performance of an officer's duties. Therefore, the State asserts, the battery should not be the basis for the imposition of vicarious liability.
The battery on Jackson during the training session was obviously "employmentrooted." A battery arising out of horseplay was also reasonably incidental to the performance of the state trooper's job duties. The trial testimony established the troopers were required to attend a defensive tactics training *628 session annually. Delatte, Jackson and Futrell testified that horseplay had occurred on other occasions during these sessions. The incident occurred during the hours of employment and on the employer's premises. Thus, we conclude the tortious conduct of Frisard was so closely connected in time, place, and causation to his employment duties as to be regarded as a risk of harm fairly attributable to the employer's business. Moreover, we note that whether the employer receives benefit from the employee's conduct is not a decisive factor in this analysis. See Benoit v. Capitol Mfg. Co., 617 So.2d 477, 479 (La.1993). We find the trial court properly regarded Frisard's conduct of striking Jackson to be within the scope of his employment, thereby resulting in the State being liable in tort to Jackson for injuries caused by the battery.

C. Loss of Earning Capacity
The State asserts the trial court erred in calculating plaintiff's $120,000.00 award for impairment of earning capacity. The State urges the record supports an award of only $86,301.00, and that a portion of that loss is attributable to some of plaintiff's physical conditions which are not related to the accident in question.
A loss of future earning capacity award is not based merely upon the difference between a plaintiff's earnings before and after a disabling injury, but also on the loss or reduction of an injured person's ability to earn money. Earning capacity is not necessarily determined by actual loss. Damages may be assessed for the deprivation of what the injured person could have earned despite the fact that he may never have seen fit to take advantage of that capacity, if the injury has deprived him of a capacity he would have been entitled to enjoy, even though he never profited from it. Hobgood v. Aucoin, 574 So.2d 344, 346 (La.1990).
Due to Jackson's physical limitations resulting from his back injury, he was unable to return to work as a state trooper. Jackson was placed on disability retirement at the beginning of 1991. Since that time, he has been performing investigative work for a private firm on a part-time basis. At the time of trial, he was earning $17.00 per hour, which Jackson explained was a higher per hour earning than what he was earning when he worked for the State. However, Jackson testified he is unable to work full-time due to his physical limitations; he is uncomfortable sitting for long periods of time, which is a requisite for some of the surveillance work he performs for his employer.
Julius Bombet, one of the directors of the investigative company for which Jackson works, confirmed Jackson's testimony that he is not a full-time employee due to his physical limitations. Bombet testified that a considerable amount of overtime work would be available to Jackson if he were physically able to perform the work. Bombet testified that if Jackson were able to work on a fulltime basis, he would be able to earn about $35,000.00 per year, and if he were able to work some overtime, he would be able to earn approximately $45,000.00 per year. These figures were based on Jackson's rate of pay at the time of trial. Bombet also stated his full-time employees generally received an annual raise.
Dr. G. Randolph Rice, an economist, testified that plaintiff's work life expectancy at the time of the trial was 14.19 years. Rice calculated the present value of the earnings which Jackson would have earned with the State, based on that work life expectancy, to be $284,123.00. The present value of Jackson's continued employment with Bombet over that same period of time was $157,897.00.[8] Accordingly, Rice concluded Jackson's future lost wages were $126,226.00.
Rice also testified that he calculated Jackson's future lost wages to be $240,991.00, if he based his figures on Jackson working fulltime, earning $35,000.00 per year. He calculated the future lost wages to be $354,959.00, when he based his figures on Jackson working full-time and overtime, earning $45,000.00 per year.
*629 When reviewing a trial court's award for loss of earning capacity, an appellate court should give great deference to the trial court. Thibodeaux v. USAA Casualty Ins. Co., 93-2238 (La.App. 1st Cir. 11/10/94); 647 So.2d 351, 361. We find Rice's uncontroverted economic testimony supports the $120,000.00 award for loss of earning capacity. Rice's testimony establishes a range of future lost wages from $114,765.00 to $228,733.00 in addition to the future lost wages of $126,226.00. These figures reflect the additional income Jackson could have earned had he been able to work as a private investigator without the physical limitations which resulted from his back injuries. We cannot say the trial court abused its great discretion in awarding this amount.
Furthermore, although the State contends that some of Jackson's loss of earning capacity is attributable to other physical problems not related to his back injury, we find the record does not support this assertion. Although there is evidence that Jackson has other medical problems, the record does not establish whether these other problems restrict Jackson's ability to work. Accordingly, having found sufficient evidence that plaintiff has physical limitations which restrict his ability to work on a full-time basis as a result of his back injury, we affirm the trial court's $120,000.00 award for impairment of earning capacity.

D. Business Pursuits Exclusion
State Farm asserts its policy excludes coverage for Frisard's actions while he is engaged in a business pursuit. Although State Farm contends the court erred in finding that Jackson's injury was the result of horseplay, State Farm also argues alternatively that the "`horseplay' of practicing the defensive tactics was integral to and required by the training class" and was not "outside [Frisard's] employment duties." State Farm maintains Jackson's injury would not have occurred "but for" his employer's requirement that he and Frisard attend and participate in the training class, and that the business pursuits exclusion of the homeowner's policy is therefore applicable. State Farm further urges the trial court's reasons are internally inconsistent because the court found Frisard committed a battery within the course and scope of his employment but also found the activity was horseplay which was ordinarily incident to non-business pursuits.[9]
The State Farm policy provides, in pertinent part:
1. Coverage L [Personal Liability] and Coverage M [Medical Payments To Others] do not apply to:
b. bodily injury or property damage arising out of business [10] pursuits of any insured.... This exclusion does not apply:
(1) to activities which are ordinarily incident to non-business pursuits.... (Emphasis omitted and footnote added.)
Insurance policies are liberally construed in favor of coverage, and exceptions to coverage are strictly construed against the insurer. La. C.C. art. 2056. Ambiguities are construed in favor of coverage. Capital Bank & Trust Co. v. Equitable Life Assurance Society of the United States, 542 So.2d 494, 496 (La.1989). The insurer has the burden of proving that an exclusion precludes recovery. Id.
At the time the incident which caused Jackson's injury occurred, Frisard was certainly engaged in a business pursuit; his participation in the training session was required by his employment as a state trooper. The seminal issue presented is whether the horseplay which took place during the training session was an activity which is "ordinarily incident to non-business pursuits."
*630 In LeBlanc v. Broussard, 396 So.2d 535 (La.App. 3d Cir. 1981), the court found the defendant was engaged in a business pursuit while driving his tractor to a field where he was to cut hay for a price as part of his partnership's business activities. The court found that defendant's homeowner's policy did not provide coverage for injuries resulting from a tractor-automobile collision which occurred while the defendant was driving the tractor from his home to the field. The court concluded defendant was driving the tractor in pursuit of a business undertaking and that the activity was not "ordinarily incident to non-business pursuits." Id. at 537.
In LeBlanc, the defendant-insured attempted to analogize "business pursuits" with the general rule in workers' compensation cases that an accident befalling an employee while he is going to and from work does not occur in the course of his employment, contending that until he reached the field and began cutting grass he was not engaged in a business pursuit.
In addressing the business pursuit exclusion, the court stated:
The purpose of the "business pursuits" exclusion in a homeowner's policy is to lower rates by removing coverage which is not essential to the purchasers and which would require specialized rating and underwriting. The terms, "business pursuits" and "course of employment," serve different purposes in these separate contexts and are not analogous in the circumstances.
Id. at 536 (citation omitted).
In applying the non-business pursuit exception, the court referred to the following discussion in Appelman's Insurance Law and Practice (Berdal ed.), Vol. 7A, § 4501.10, pp. 276-279:
The business pursuit exclusion is intended to apply to all activities that are involved in furtherance of any business, employment, trade, occupation or profession. There are relatively few functions, such as walking, opening and closing doors, bending or standing that a person performs in a business that cannot be viewed in isolation as nonbusiness activity. One cannot perform normal work without engaging in such functions or activities, and to treat these activities in isolation as incidental to nonbusiness activity would render this exclusion meaningless.
. . . . .
When an activity, such as horseplay or a purely social amenity like preparing a cup of coffee, has lost its work related identification, it becomes an activity "incidental to non-business pursuits."
The court further referenced 48 ALR 3d 1096, 1099, stating:
Such excepted activities have generally been held to denote activities of the insured which are not associated or related to his business pursuits or commercial activity.
The case of Jackson v. Lajaunie, 270 So.2d 859 (La.1972), also presents an example of the application of the pertinent policy language. In Jackson, the operator of a gas station accidentally shot a customer while playing a practical joke. In dicta, the supreme court acknowledged it agreed with the lower court's finding that an owner's injury of a customer by practical joke while receiving the customer's payment on the business premises was within the exception to the exclusion, and that practical jokes are ordinarily incident to non-business pursuits. Id. at 863.[11] Otherwise, our courts have not addressed whether horseplay, which is not itself a business pursuit of the insured within the meaning of the exclusion but is an activity that arises out of a business pursuit, should be considered an activity ordinarily incident to non-business pursuits.[12]
*631 In order to determine whether the exception (for activities which are ordinarily incident to non-business pursuits) to the business pursuits exclusion applies, the inquiry should not be whether the insured was engaged in a business pursuit at the time of the accident, but rather whether the particular activity engaged in at the time of the accident was nevertheless one ordinarily incident to non-business pursuits. See New Jersey Property Liability Guaranty Assoc. v. Brown, 174 N.J.Super. 629, 632, 417 A.2d 117, 119 (N.J.Super.A.D.1980), cert. denied, 85 N.J. 462, 427 A.2d 561 (N.J.1980). We note the modifying language of the exception (for activities ordinarily incident to nonbusiness pursuits) clearly narrows the scope of the exclusion that precedes it. Id., 417 A.2d at 119.
In the present case, we find it is logical to conclude that Frisard's apparently impulsive action of striking Jackson is the type of activity which is ordinarily incident to nonbusiness pursuits. We construe the policy language in question to provide coverage for acts which by their nature are not associated with the insured's business pursuits, but which are only casually related to the business activities. See New Jersey Property Liability Guaranty Assoc., 174 N.J.Super. at 632, 417 A.2d at 119; State Farm Fire and Casualty Co. v. National Union Fire Ins. Co., 87 Ill.App.2d 15, 230 N.E.2d 513, 516 (III.App.1967). The testimony was undisputed that none of the training maneuvers practiced during the session involved striking the back in any manner. Thus, we find Frisard's action of striking Jackson's back was not an activity associated with the defensive training session, but was in this instance only casually related to the business activity of the training session, and ordinarily incident to nonbusiness pursuits. The trial court properly found the "business pursuits" exclusion of the State Farm policy did not exclude coverage for Jackson's injuries resulting from the incident. We find no inconsistency in the trial court's findings on the issues of vicarious liability and insurance coverage.

IV. CONCLUSION
We find no error in the trial court's finding that Frisard intentionally struck Jackson and that plaintiff's recovery against the State is not limited to workers' compensation benefits. Because the incident was employmentrooted and was closely connected in time, place, and causation to Frisard's employment duties, we find the trial court properly regarded Frisard's conduct of striking Jackson to be within the scope of his employment and a risk of harm fairly attributable to the State, resulting in the State being liable in tort to Jackson for injuries caused by the battery. Additionally, the economic testimony supports the trial court's award for impairment of earning capacity. Finally, we conclude the trial court properly found that the damages resulting from this incident were not excluded from State Farm's homeowner's liability policy coverage pursuant to the "business pursuits" exclusion because Frisard's conduct of striking Jackson was the type of activity which is ordinarily incident to non-business pursuits. For these reasons, the trial court's judgment in favor of plaintiff is affirmed. The total costs of this appeal in the amount of $877.24 are to be divided equally between the State of Louisiana, through the Department of Public Safety and Corrections, and State Farm Fire and Casualty Company.
AFFIRMED.
NOTES
[1] Judge Carl A. Guidry, retired, is serving as judge pro tempore by special appointment of the Louisiana Supreme Court.
[2] The transcript identifies Frisard as Frizard.
[3] Jackson's wife, Kaye Bankston Jackson, was also named as a plaintiff and sought recovery for loss of consortium. We note the trial court's $30,000.00 award for loss of consortium is not contested on appeal.
[4] A State Farm policy issued to Beryl M. Forres was introduced into evidence as a joint exhibit of the parties. The parties do not dispute that the policy insured the home of Frisard and that he was an insured under the policy.
[5] The judgment against State Farm was limited to the amount of its policy limit of $100,000.00, plus interest on its policy limit from date of judicial demand until paid.
[6] Also see, Benoit v. Capitol Mfg. Co., 617 So.2d 477 (La.1993), wherein the supreme court applied the LeBrane test.
[7] LeBrane described the employment connection tort test as similar to that used in determining whether a compensation claim is one arising out of and in the course of employment. Benoit, 617 So.2d at 479; LeBrane, 292 So.2d at 218 n. 4.
[8] Rice's calculations were based on an average of Jackson's earnings from the investigative firm over the three-year period prior to trial.
[9] State Farm also presents an argument in a footnote in its appellate brief that if this court agrees with the trial judge that a battery occurred, State Farm's "intentional act" exclusion is applicable. We find no merit in this argument. The trial court found "there was no evidence that Frisard subjectively intended Jackson to suffer injury as a result of the `horseplay'" and concluded the intentional act exclusion was not applicable based on the reasoning of Breland v. Schilling, 550 So.2d 609 (La.1989). We find no error in this determination.
[10] The policy defines "business," in pertinent part, as "a trade, profession or occupation."
[11] The Jackson court found insurance coverage was excluded pursuant to another exclusionary clause.
[12] State Farm urges the "but for" analysis set forth in Jim Carey Distributing Co. v. Zinna, 589 So.2d 526 (La.App. 1st Cir.1991) should be applied in this case. However, we note that the Jim Carey case did not involve a "non-business pursuits" exception to the "business pursuits exclusion." Thus, we do not find the case to be dispositive of the issue under review.